## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARCELLA HOLLOMAN         :

                           :

                           :

      v.                   :          Civil No. CCB-14-1516

                           :

                           :

STEPHANIE RAWLINGS-BLAKE, *et al.*     :

## MEMORANDUM

Plaintiff Marcella Holloman, proceeding pro se and on behalf of her deceased son, Maurice Donald Johnson, filed this civil rights lawsuit based on the shooting death of her son in an incident involving two Baltimore Police Department ("BPD") officers. All defendants but the officers have already been dismissed. (*See* Mem. & Order, ECF Nos. 46, 47.) The officers— Paul Markowski and Gregory Bragg—have filed a motion for summary judgment. Holloman has filed a second motion for appointment of counsel, and a motion for reconsideration of the court's prior order dismissing the Mayor and City Council as defendants.[1] For the reasons stated below, the officers' motion will be granted, and Holloman's motions will be denied.

## BACKGROUND

The undisputed record reflects the following.[2] Maurice Donald Johnson was a 31-year-old man who was living with his mother, Marcella Holloman, at their shared home in Baltimore. (Holloman Tr. 1, 17.) Johnson had been diagnosed with bipolar disorder in 2009. (*Id.* at 5.) On several occasions, his behavior required Holloman to call the police for help. (*Id.* at 4.) Those

---

[1] Also pending is Holloman's motion to file a surreply to Commissioner Batts' reply. This motion will be denied as moot because Batts has already been dismissed from this case.

[2] The record here is relatively sparse. The only substantive material Officers Markowski and Bragg provide to support their motion is a transcript of the recorded statement Holloman provided to detectives soon after the shooting. (*See* Holloman Recorded Statement ("Holloman Tr."), ECF No. 53-3.) Because they wish to avoid a protracted discovery dispute, Officers Markowski and Bragg rely primarily on the facts in Holloman's amended complaint and the recorded statement. (*See* Defs.' Mot. Summ. J. 2 n.2, ECF No. 53-1.) Holloman submits no materials with her opposition. The court relies on her recorded statement when possible, but otherwise cites to her amended complaint.

incidents—including one in which he was found "jumping on top of cars . . . naked"—sometimes led him to a hospital psychiatric ward. (*Id.* at 5.)

On the afternoon of May 19, 2012, Holloman was hosting a birthday party in her backyard for her six-year-old granddaughter. (*Id.* at 1.) Roughly ten people, including five other children, were at the party. (*See id.* at 3.) At around 5:00 p.m., Holloman heard a big "splash" that sounded as if something heavy had fallen and broken on the upper floor of the house. (*Id.* at 1; Am. Compl. 10, ECF No. 6.)[3] When she went upstairs to Johnson's room, Holloman saw that he had "busted" both his wall mirror and 42-inch television. (Holloman Tr. 1, 3-4.) When Holloman asked why he was "breaking up stuff in [her] house[,]" Johnson said they were his belongings and he could break them if he wanted. (*Id.* at 1.) Believing that Johnson's behavior was "getting out of hand[,]" Holloman said she needed to take him to the hospital after the party to get treatment. (*Id.* at 1, 4.) Upset by that statement, Johnson responded that she should call the police, as she had done previously, because he "ain't going nowhere." (*Id.*) Holloman did not call the police at that time, and instead went back outside to "try to continue with the birthday party[.]" (*Id.* at 1.)

Soon after, Holloman's daughter entered the house, went upstairs, and got into a verbal fight with Johnson that turned into a "tussl[e]." (*Id.* at 1, 8-9.) At that point, to ensure that "all the kids w[ere] safe[,]" Holloman directed everyone else to leave the house and get into a car. (*Id.* at 2.) Meanwhile, Johnson began pulling at the screen to the back door in an attempt to "rip it off the frame." (*Id.* at 1, 9.) He succeeded, ripping two door screws out of the wall. (*Id.* at 10.) He then went upstairs, grabbed his mattress, and somehow pulled it outside onto the front lawn. (*Id.* at 2, 11.) He then began tearing up the mattress. (*Id.* at 11-12.) Holloman's daughter locked the front door, while Holloman called 911 from the back of her house at about 5:05 p.m.,

_____

[3] Because Holloman's amended complaint does not have numbered paragraphs, citations are to the page number.

requesting that both the BPD and Baltimore Fire Department assist her in bringing Johnson to the hospital. (*Id.* at 12; Am. Compl. 10.) Meanwhile, Johnson tried to reenter the house through the front door but, finding it locked, began kicking it. (Holloman Tr. 13.) Unable to enter through the front door, Johnson announced "he [was] coming in" and proceeded around the house to the back door. (*Id.*) But Holloman successfully locked that door before he could get inside. (*Id.*) Johnson then began "kicking the hell out of the door." (*Id.* at 14.)

At about 5:17 p.m., Officer Markowski arrived. (*Id.*; Am. Compl. 10.) Holloman let him in through the front door. (Holloman Tr. 14.)[4] Soon after, Officer Bragg arrived. (Am. Compl. 11.) Holloman then told the officers[5] that Johnson had "psych issues," had "zapped out," and "wasn't gonna stop." (Holloman Tr. 14.) Holloman also told the officers, "don't sho[o]t him but just taze him cause I do know tazing make him stop." (*Id.*) Johnson was still kicking on the door as Holloman, her daughter, and the two officers were assembled just on the other side. (*Id.*)

The officers proceeded to unlock and open the back door. (*Id.*) Once the door was opened, "everybody" converged in a "bundle around [Johnson]," while yelling at him to calm down. (*Id.* at 14-15.) The officers each tried to grab one of Johnson's arms to restrain him. (Am. Compl. 12.) But Johnson "wouldn't stop," and instead dragged the group through the kitchen, living room, and into the dining room. (Holloman Tr. 15.) Once there, the "fighting" began. (*Id.*) Johnson started "lunging" at, and "punched," one of the officers. (*Id.*) Eventually, Johnson "got [Officer Markowski] down" onto the floor. (*Id.*) Johnson was now "on top" and Officer Markowski was "on the bottom." (*Id.*; *see also* Am. Compl. 12 ("Maurice was able to

---

[4] Holloman's amended complaint alludes to the idea that Officer Markowski exceeded the scope of any consent she may have provided to enter her home. (*See* Am. Compl. 11 ("Officer Markowski paid 'no mind' to Plaintiff's suggestion and he continued to enter the residence.").) But her recorded statement shows that, when the officers arrived at her front door they proposed going around to the back of the house, to which Holloman "said no[,] you can walk right through the house" to the back door. (Holloman Tr. 2.)

[5] Holloman's recorded statement does not make clear the sequence in which the officers arrived and, accordingly, whether both officers heard her admonitions. Sometimes, her statements imply she warned only Officer Markowski. Other times, her statements imply she warned both. The court assumes that both heard Holloman's warnings.

get on top of Officer Markowski . . . .").) Officer Bragg tried to pull Johnson off of Officer

Markowski, but Johnson "lunged back at him." (Holloman Tr. 15.) Throughout this struggle,

everybody was "telling [Johnson] to calm down, calm down" and "to stop," but Johnson would

do neither. (*Id.* at 2, 14.) As Officer Markowski and Johnson continued to tussle on the dining

room floor, Holloman saw Officer Bragg's arm "go up" and down several times. (*Id.* at 16.) At

some point, she observed Officer Bragg "reach for his gun[.]" (*Id.* at 2.) Holloman then heard

several gunshots. (*Id.* at 16.)[6] Johnson died as a result of the wounds. (Am. Compl. 12.)

Holloman's amended complaint alleged a plethora of claims against many defendants.[7]

In July and August of 2014, three separate groups of defendants filed motions to dismiss, (*see*

ECF Nos. 11, 13, 32), all of which the court granted on December 12, 2014, (ECF Nos. 46-47).

On February 19, 2015, the two remaining defendants—Officers Markowski and Bragg—filed a

motion for summary judgment, to which Holloman responded on February 26, 2015. On April

15, 2015, Holloman filed a second motion for appointment of counsel. On May 11, 2015,

Holloman filed a motion for reconsideration of the court's prior order dismissing the Mayor and

City Council from this case. The officers filed no response to either motion.

## ANALYSIS

### I. Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is

genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party*

---

[6] Holloman's recorded statement does not clarify how many shots were fired, or who fired each shot. Her amended complaint alleges that Officer Markowski fired "twice at point blank range, striking [Johnson] in the chest[,]" and that Officer Bragg fired once, "striking [Johnson] in the back." (Am. Compl. 12.) Thus, the court assumes that, at most, a total of three shots were fired.

[7] The court's prior memorandum provides more background. (*See* Mem. 1-4, ECF No. 46.)

*of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48.  The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015).  At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 2003)).

Holloman brings a claim under 42 U.S.C. § 1983 based on the officers' alleged use of "excessive and deadly force" in violation of the Fourth Amendment.  (Am. Compl. 13.)  The officers invoke the doctrine of qualified immunity, which "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Meyers v. Balt. Cty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013).  Qualified immunity applies unless (1) "the facts that a plaintiff has . . . shown make out a violation of a constitutional right" and (2) "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  The officers argue that neither step is satisfied here.  The

court concludes that the record does not show the violation of a Fourth Amendment right because, under the circumstances, neither officer used excessive force against Johnson.[8]

An excessive force claim is evaluated under the Fourth Amendment's "standard of objective reasonableness." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The standard's "proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* And the analysis "focus[es] on the moment that the force is employed." *Henry*, 652 F.3d at 531 (citing *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996)). Because "[t]he intrusiveness of a seizure by means of deadly force is unmatched[,]" an officer may use deadly force only if there is "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . ." *Tennessee v. Garner*, 471 U.S. 1, 9, 11 (1985).

Judged under this standard, the officers' use of deadly force here was objectively reasonable. Simply put, the record shows that a reasonable officer in either officer's shoes would have found sufficient justification to use such force because, at the moment they shot Johnson, the officers had probable cause to believe that Johnson posed a threat of serious

---

[8] Accordingly, the court need not address whether the right at issue was clearly established.

physical harm to Officer Markowski.[9]  At that moment, Officer Bragg could see that his partner was helplessly pinned to the floor, straddled by a thrashing and unpredictable Johnson.  Under these circumstances, Officer Bragg was justified in firing at Johnson to protect his partner from imminent harm, and Officer Markowski was justified in firing at Johnson to protect himself.  *See City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015) ("Nothing in the Fourth Amendment barred [the officers] from protecting themselves, even though it meant firing multiple rounds.").

This holds true even though Johnson was unarmed.  While it is unclear exactly how forcefully Johnson was attacking Officer Markowski, several facts known to the officers at the time justified an inference that Johnson was about to seriously harm Officer Markowski.  First, Johnson had already violently damaged various household objects and fixtures, suggesting he had the capacity—and, in that moment, an inclination—for violence.  Second, Holloman had advised the officers that Johnson's erratic behavior would not stop.  Third, Johnson had shown an inability or unwillingness to obey either Holloman's pleas or the officers' orders to stop.  Fourth, Johnson had, in fact, just punched at least one of the officers.  Fifth, right before he fired his gun, Officer Bragg had been "trying [to] pull [Johnson] off" of Officer Markowski, but was unsuccessful.  (Holloman Tr. 16.)  These facts, considered together, render reasonable the officers' use of deadly force.

Other cases involving the use of deadly force against people with mental illnesses support this conclusion.  In *Rockwell v. Brown*, for example, the Fifth Circuit considered an excessive force claim brought by the parents of a son with "both bipolar disorder and schizophrenia[,]" who was fatally shot by police officers seeking to restrain him after his parents had called for

---

[9] The court finds that this threat of serious physical harm did not extend to Officer Bragg, who remained free of Johnson's control.

assistance.  664 F.3d 985, 988 (5th Cir. 2011).  As soon as the officers breached the door to the

son's room, he "rushed towards" one officer and began "attack[ing] him" with two eight-inch

knives.  *Id.* at 989.  The Fifth Circuit held that "deadly force was justified" because the son

"posed a significant and imminent threat of serious physical harm to one or more of the officers."

*Id.* at 992.  In *Sheehan*, the Supreme Court likewise considered a situation in which police

officers found themselves on the other side of a door, behind which was a woman "who was

suffering from a mental illness and had become violent."  135 S. Ct. at 1769.  After the officers

opened the door, the woman, who had a knife in her hand, "kept coming at the officers until she

was only a few feet from a cornered [o]fficer . . . ."  *Id.* at 1775 (internal quotation mark and

citation omitted).  The Supreme Court held that the officers were legally justified in "firing

multiple rounds" in response.  *Id.*  Here, Johnson wielded no knife.  But, as in *Rockwell*, he

lunged at the officers as soon as the door was opened, and immediately began fighting with

them.  Once Officer Markowski was pinned beneath Johnson, he was effectively cornered in the

same way as the officer in *Sheehan*.  In short, case law suggests the imminent threat of harm

posed by Johnson justified the officers' decision to use deadly force.[10]

Holloman makes several arguments why the use of deadly force here was unreasonable

and therefore unconstitutional, but none have merit.  First, she argues that "there [wa]s

absolutely no reason that two armed police officers cannot restrain one unarmed man."  (Pl.'s

Opp'n 1, ECF No. 55.)  On her version of the facts, however, the officers tried to restrain

Johnson, but were unsuccessful.  Second, she argues that "at no time could any of these officers

---

[10] The Fourth Circuit's excessive force decision in *Meyers v. Baltimore County, Maryland*—in which an officer's ten uses of a taser on a man with bipolar disorder caused him to die—is also instructive.  713 F.3d 723, 727-29 (4th Cir. 2013).  There, the Fourth Circuit held that the officer's first three uses of the taser were objectively reasonable because the man was "actively resisting arrest" and "posed an immediate threat to the officers' safety[.]"  *Id.* at 733.  But the Fourth Circuit held that it was objectively unreasonable for the officer to continue using the taser once the man "did not pose a threat to the officers' safety and was not actively resisting arrest[.]"  *Id.* at 735.  Here, Johnson continued to pose a threat to Officer Markowski's safety and never stopped actively resisting arrest, which suggests the officers acted objectively reasonably under the circumstances.

demonstrate that they were in fear for their lives." (Pl.'s Opp'n 1.) Yet the record reflects that either officer very well could have feared for Officer Markowski's life, or at least for "serious physical harm," when he was overpowered by Johnson and brought onto his back. Third, she appears to argue that, because she called 911 merely to ask for assistance in transporting Johnson to the hospital—and not to report any crime allegedly committed by him—the officers had no probable cause to arrest Johnson. (*See* Pl.'s Opp'n 2, 7-8.) Even so, once they arrived, the officers had probable cause because of the violence and property destruction that had been reported and the active attempt by Johnson to break in the door in their presence. *See Virginia v. Moore*, 553 U.S. 164, 171 (2008) ("[W]hen an officer has probable cause to believe a person committed even a minor crime in his presence, . . . [t]he arrest is constitutionally reasonable.").

The court is very sympathetic to Ms. Holloman, who has suffered a tragic loss. This case illustrates the difficult choices facing both family members and law enforcement officers in dealing with individuals exhibiting violent behavior perhaps because of mental illness. The officers' use of deadly force, however, was objectively reasonable under the circumstances they confronted. The officers therefore did not violate the Fourth Amendment, and summary judgment will be granted in their favor.[11]

## II. Second Motion for Appointment of Counsel

For a second time, Holloman has moved for appointment of counsel. The court has the discretion to "request an attorney to represent any person unable to afford counsel[,]" 28 U.S.C. § 1915(e)(1), when a case presents "exceptional circumstances." *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (citing *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975)). Those circumstances may exist when, for example, "a pro se litigant has a colorable claim but lacks the capacity to present it[.]" *Id.*

---

[11] Because the use of force was objectively reasonable, any state law claim for assault or battery would also fail.

Holloman believes she is "entitled to redress," but states she can neither afford to litigate this case nor do so on her own because of its complexity. (Pl.'s Mot. Counsel 1, ECF No. 58.) Holloman also argues she should be appointed counsel "[b]ecause of circumstances that have changed" since the case began. (*Id.*) Holloman notes her unsuccessful efforts to obtain counsel from several dozen law firms and legal aid organizations as well as her recent bouts of post-traumatic stress disorder and agoraphobia—both of which have stemmed from the "horrific" incident that precipitated this litigation. (*See id.* at 1-2.)

The court acknowledges Holloman's financial hardship, as well as the trauma she has experienced due to her son's tragic death, but concludes that her claim lacks merit for the reasons explained above, based largely on Holloman's own version of events. Accordingly, the case does not present "exceptional circumstances," and the court will deny Holloman's motion for appointment of counsel.

### III. Motion for Reconsideration

Holloman also moves for reconsideration of the court's prior order dismissing the Mayor, City Council, and City of Baltimore from this case.[12] In support of her motion, Holloman argues the City has "sufficient practical links" with the BPD to be held liable for officer conduct. (Pl.'s Mot. Recons. 3.) She points to conflicting law on the question of whether BPD officers are City employees for the purposes of § 1983 liability. *Compare Creasy v. Mayor of City of Balt.*, Civ. No. JFM-11-1870, 2012 WL 1044426, at *2 (D. Md. Mar. 26, 2012) ("[T]he Baltimore City Police Department is an agency of the State, not an agency of the City of Baltimore and thus not

---

[12] Holloman's motion does not make clear exactly as to which parties she seeks reconsideration. In her conclusion she states her desire for reconsideration of the court's "order dismissing the defendant *Mayor* Stephanie Rawlings-Blake from this action." (Pl.'s Mot. Recons. 8, ECF No. 60 (emphasis added).) Elsewhere, she suggests the "*City Council* of Baltimore" was improperly dismissed. (*Id.* at 2 (emphasis added).) Finally, her motion appears to make arguments suggesting "the *City* is generally liable for Baltimore police conduct . . . ." (*Id.* at 4 (emphasis added).) The court need not decide the scope of Holloman's motion because, as described below, Holloman has not shown circumstances warranting reconsideration of the court's decision regarding any of these defendants.

within the control of the Mayor."), *with Humbert v. O'Malley*, Civ. No. WDQ-11-0440, 2011

WL 6019689, at *5 (D. Md. Nov. 29, 2011) (denying City's motion to dismiss in part because of

the "strong practical links" between the City and the BPD).  Even assuming the court's prior

ruling was wrong, none of these defendants can be liable under § 1983 because, as already

explained above, no underlying constitutional violation occurred.  *See, e.g.*, *Covenant Media of*

*S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007) (concluding that, because

the plaintiff had not proven "harm . . . caused by a constitutional violation," it was "unnecessary"

to address whether the municipality was responsible for that alleged violation (quoting *Collins v.*

*City of Harker Heights*, 503 U.S. 115, 120 (1992))).  Accordingly, the court will deny

Holloman's motion for reconsideration.

## CONCLUSION

For the reasons stated above, Officer Markowski and Officer Bragg's motion for

summary judgment will be granted; Holloman's second motion for appointment of counsel and

motion for reconsideration will be denied; and Holloman's motion to file a surreply to

Commissioner Batts' reply will be denied as moot.

A separate Order follows.


_____July 22, 2015_____                                    _____/s/_____
Date                                                                          Catherine C. Blake
                                                                                United States District Judge